**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,

                                Case No. 03-80359
v.                              Hon. Gerald E. Rosen

ALBERTO FLORES,

       Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING**
**COUNT ONE OF FIRST SUPERSEDING INDICTMENT CHARGING**
**DEFENDANT ALBERTO FLORES WITH CONSPIRACY TO DISTRIBUTE**
**WITH INTENT TO IMPORT AND TO IMPORT PSEUDOEPHEDRINE**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____September 2, 2010_____

PRESENT:  Honorable Gerald E. Rosen
                 Chief Judge, United States District Court

## I. INTRODUCTION

Defendant Alberto Flores, along with several other individuals, has been charged

in an October 8, 2003 first superseding indictment with a single count of conspiracy to

distribute with intent to import and to import pseudoephedrine from Canada into the

United States, contrary to 21 U.S.C. §§ 959(a)(1) and 960(d)(3). Defendant has waived

his right to a trial by jury, and instead has requested a trial by the Court on all issues of

fact and law arising from the charge against him.

Accordingly, on January 26, January 27, and April 13, 2010, the Court conducted a

bench trial on the charged conspiracy offense. During the course of this proceeding, the Court heard the testimony of three witnesses called by the Government: (i) U.S. Immigration and Customs Enforcement ("ICE") Special Agent Cory Howe, (ii) co-defendant Enrique Barajas, a/k/a Enrique Sanchez, and (iii) co-defendant Nasir Baste. In addition, the Court heard the testimony of co-defendant Shahin Judeh, who was called as a witness by the Court pursuant to Fed. R. Evid. 614(a). Finally, the Government introduced a number of exhibits for the Court's consideration. The defense elected not to call any witnesses.

Having reviewed and considered the testimony and exhibits offered during the three-day bench trial, and having also reviewed the applicable statutes and case law, the Court is now prepared to decide the issues of fact and law raised during the trial, and to resolve the overarching question presented at trial: namely, whether the Government has proven Defendant guilty of the charged conspiracy offense beyond a reasonable doubt. This opinion and order sets forth the Court's findings of fact and conclusions of law on these matters. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II. <u>FINDINGS OF FACT</u>

### A. The Nature and Scope of the Charged Conspiracy Offense

1. The Government called ICE Special Agent Cory Howe as its first witness at trial to offer testimony and evidence as to the overall nature and contours of the charged

conspiracy offense.

2.    Special Agent Howe testified that in early January of 2003, he met with a confidential source ("CS") who told the agent about his meeting with co-defendant Ali Salem at a New Year's Eve party in Chicago, Illinois on December 31, 2002.

3.    The CS advised Special Agent Howe that he had learned at the New Year's Eve party that defendant Salem was seeking truck drivers to transport approximately 200 boxes of pseudoephedrine from Windsor, Canada to the United States.

4.    Special Agent Howe instructed the CS to meet again with Salem on January 4, 2003.

5.    On January 4, 2003, the CS met with Salem and co-defendant Shahin Judeh in Dearborn, Michigan.  The CS learned at this meeting that Salem and Judeh had a supply of pseudoephedrine in a storage unit in Windsor that they wished to transport by truck to the United States.

6.    At a subsequent meeting on January 7, 2003 at a restaurant in Portage, Michigan, the CS met with Salem, Judeh, and co-defendant Mohammad Awad.  The men discussed paying $10,000 to a truck driver who was working with the CS to bring boxes of pseudoephedrine from Canada to the United States.  The Government introduced surveillance photographs of this January 7 meeting as Exhibits 6A through 6H.

7.    On January 10, 2003, Salem, Judeh, and Awad met at a restaurant in Dearborn, Michigan with an undercover ICE agent, who posed as a truck driver and represented that he could secure the assistance of other truck drivers to transport

pseudoephedrine from Windsor to the United States.

8.      At this January 10 meeting, the three co-defendants agreed to make a $10,000 initial payment to the undercover agent to secure transportation of the pseudoephedrine, with an additional $10,000 payment to be made once the shipment was delivered to the United States.  The Government introduced surveillance photographs of this meeting as Exhibits 2A through 2C.

9.      On January 16, 2003, a meeting was held at a Big Boy restaurant in Dearborn, with Judeh, Awad, the CS, the undercover ICE agent, and an undercover Drug Enforcement Administration ("DEA") agent in attendance.  At this meeting, Judeh and Awad paid the undercover agents $10,000 in U.S. currency, and gave them general instructions as to where to go in Canada to meet with other individuals who would assist them in loading their trucks with pseudoephedrine for transport to the United States.  The Government introduced surveillance photographs of this January 16 meeting as Exhibits 3A through 3D.

10.     That same day, the undercover agents traveled to Canada and met with Awad, co-defendant Nasir Baste, and co-defendant Kamal Judeh.

11.     While under surveillance, Baste traveled from this meeting to a storage facility, went inside Unit #507 of this facility, and then returned to the meeting place, where he showed the undercover agents a copy of a Canadian search warrant and explained that no pseudoephedrine was available for transport to the United States that day.

12.     Later that same day, January 16, 2003, the undercover agents returned to the Big Boy restaurant in Dearborn and met with Judeh, who stated that he had just lost over $2 million in drugs seized by the Canadian government, and that he would need an additional two weeks to secure more pseudoephedrine for transport by the undercover agents.

13.     Upon looking into the Canadian search warrant that was found in the storage unit, Special Agent Howe learned that the search warrant had been executed on December 17, 2002, resulting in the seizure of roughly nine million tablets of pseudoephedrine from the storage unit.  The Canadian authorities provided Special Agent Howe with photographs of the execution of the search warrant, which were introduced by the Government as Exhibits 1A through 1H.  The Canadian law enforcement authorities also advised Special Agent Howe that the seized tablets had come from G & C Imports in Montreal, Canada.

14.     On January 31, 2003, the undercover agents and the CS met with Shahin Judeh and Nasir Baste, and they were advised of an effort to obtain additional pseudoephedrine pills from Montreal, Canada.  The Government introduced surveillance photographs of this meeting as Exhibits 4A and 4B.

15.     On February 13, 2003, the CS received a call from Shahin Judeh, who indicated that he was in Saginaw, Michigan and would be traveling to Dearborn later that day.  The CS and Judeh scheduled a meeting for the following day.

16.     At the scheduled February 14, 2003 meeting, Judeh arrived with an

individual he identified as Enrique, and he indicated that three individuals, including one Mexican, had been sent to Montreal to pay for a supply of pseudoephedrine. Judeh further stated that these individuals had traveled to Canada in a Denali sport utility vehicle with a false compartment. Judeh informed the undercover agent "truck drivers" in attendance at this meeting that they would travel to Montreal in six to ten days to pick up the pseudoephedrine tablets.

**B.**   **Defendant's Interactions With Certain of the Co-Defendants and His Alleged Involvement in the Charged Conspiracy Offense**

   **(i)**   **The Testimony of Co-Defendant Enrique Barajas**

17.   Co-Defendant Enrique Barajas, also known as Enrique Sanchez (and occasionally referred to by certain of the co-defendants as "Chiquito"),[1] testified at trial through an interpreter. He acknowledged that he had entered the United States illegally, and that he had been charged with and convicted of two crimes during his time in the United States, including the conspiracy offense charged in the present case and an offense charged in the Western District of Washington.

18.   As part of his agreement to plead guilty to the conspiracy offense in this case, Sanchez was advised that if he agreed to testify in this case, the Government would recommend that his sentences in this case and in the Washington case be served

---

[1]Because this witness indicated in his testimony at trial that his true name is Enrique Sanchez, the Court will refer to him by this name throughout the remainder of this opinion.

concurrently.[2]

19.     Sanchez testified that he met Defendant in California in 2002, and that the two men spoke about the possibility of engaging in the drug business together.

20.     While in California, Sanchez was introduced to co-defendant Shahin Judeh by a waitress at the restaurant where he worked, and this co-worker invited both Sanchez and Judeh to a barbeque at her family's home.

21.     Sanchez brought Defendant with him to this event, based on his understanding that Judeh was interested in meeting Mexicans who would be willing to work with him in the drug trafficking business.

22.     At this gathering, Judeh invited Sanchez to work for him in Chicago, and Sanchez also introduced Defendant to Judeh.  The three men then discussed a venture in which marijuana and cocaine would be sent to Judeh in Chicago, and Judeh in turn would provide pseudoephedrine pills to Defendant.

23.     Sanchez testified that, following this discussion, the initial transactions between Judeh and Defendant did not involve exchanges of marijuana and cocaine for pseudoephedrine, but instead consisted of cash payments from Judeh to Defendant in exchange for quantities of marijuana and cocaine.  Sanchez overheard only portions of the discussions between Defendant and Judeh regarding these transactions "because they

---

[2]Sanchez later retreated from this testimony, stating that the concurrent sentences imposed in the Washington case and in this case were simply a product of the sentencing ranges calculated under the U.S. Sentencing Guidelines and negotiated between the parties, and that these concurrent sentences were not promised in exchange for his agreement to testify or otherwise assist the Government in this case.  (*See* 1/26/2010 Trial Tr. at 68-69.)

didn't want me to hear what they were saying." (1/26/2010 Trial Tr. at 86.)

24.    After these initial cash transactions, it was Sanchez's understanding that Judeh subsequently provided pseudoephedrine pills to Defendant on more than one occasion, perhaps in early 2002, although he could not "remember the dates very well." (*Id.* at 88.)  Sanchez did not witness any such transactions, nor did Defendant ever tell Sanchez that he had received pseudoephedrine pills from Judeh.  Instead, Sanchez's knowledge of these transactions was based solely on what Judeh told him.  Likewise, Sanchez's understanding that the pseudoephedrine pills had been obtained in Canada was based solely on what Judeh told him.

25.    Sanchez recalled one occasion when he, Judeh, Defendant, and another individual (who he could not identify) met in a Chicago apartment to discuss a planned drug transaction.  Specifically, the plan under discussion called for Defendant to supply cocaine to Judeh in Chicago, and for Judeh to sell the cocaine and use the proceeds to purchase pseudoephedrine.  The pseudoephedrine purchased by Judeh would then be given to Defendant as payment for the cocaine.  Sanchez recalled that this discussion took place in November of 2002.

26.    Although Sanchez participated in this discussion, he did not personally observe Defendant provide any cocaine to Judeh as a result of this discussion. Rather, he inferred that Defendant must have done so because he observed Judeh with funds from the sale of cocaine.  Nor did Sanchez witness any delivery of pseudoephedrine pills to Defendant; rather, it was his understanding that Judeh was unable to secure a supply of

pseudoephedrine to fulfill this part of the planned transaction.

27.     Sanchez also participated in a discussion with Defendant and Judeh in which a plan was made to travel to Canada and obtain a supply of pseudoephedrine pills. During this discussion, which Sanchez recalled as occurring in Chicago in February of 2003, Judeh indicated to Defendant that $100,000 or $120,000 was needed for an initial payment on a supply of pseudoephedrine pills. Defendant, in turn, indicated that he planned to go along on the trip to Canada, and that he planned to sell the pseudoephedrine pills obtained in this transaction in California.

28.     Following this meeting, Sanchez, Judeh, and Defendant traveled from Chicago to Michigan on or around February 13, 2003. During this trip, Judeh and Defendant spoke mostly in English, which Sanchez does not understand, but he heard Defendant state that the purpose of his trip to Canada was to make an initial payment on pseudoephedrine pills.

29.     On their February 2003 trip to Michigan, Sanchez, Judeh, and Defendant traveled in a white Lexus to a hotel parking lot, where they met two other individuals driving a green Denali sport utility vehicle. Upon their arrival, Judeh and Defendant exited the vehicle, and Defendant took a piece of luggage from the Lexus and placed it in the Denali. Sanchez overheard Judeh asking Defendant for money, and it appeared to Sanchez that Defendant reached into his luggage and gave some money to Judeh. Judeh then spoke to one of the occupants of the green Denali, and gave the money to an individual inside the hotel.

30.     Following this meeting in the hotel parking lot, Sanchez and Judeh went into the hotel, stayed overnight, and then went to a restaurant the following day, where they had lunch with a man Sanchez could not identify. Special Agent Howe indicated in his testimony that this third individual was an undercover agent. As stated in the above account of Special Agent Howe's testimony, Judeh advised the undercover agent at this meeting that three people, including one Mexican, were traveling to Montreal, Canada in a Denali with a false compartment to pay for a supply of pseudoephedrine pills.

31.     Sanchez was shown surveillance photographs of this February 14, 2003 restaurant meeting, (*see* Gov't Exs. 5A, 5C, 5D, and 5F), and he confirmed that he, Judeh, and the unknown third individual were depicted in these photographs, as well as the white Lexus in which he, Judeh, and Defendant had traveled from Chicago to Michigan.

32.     After the meeting in the hotel parking lot in Michigan, Sanchez saw Defendant only one more time, in Mexico around Easter of 2003. On that occasion, Defendant indicated that the payment had been made in Canada for the supply of pseudoephedrine pills and that "[t]hey were waiting to receive" the pills, (1/26/2010 Trial Tr. at 111), and Sanchez in turn asked when Defendant was going to pay him for having introduced Defendant to Judeh.

**(ii)     The Testimony of Co-Defendant Nasir Baste**

33.     The final witness called by the Government was co-defendant Nasir Baste. Baste acknowledged that he had pled guilty and been sentenced under a two-count second superseding information in this case, on charges of conspiracy to distribute with intent to

import and to import pseudoephedrine, as well as conspiracy to commit bank fraud and access device fraud. Baste further acknowledged that his plea agreement included a cooperation provision that required him to testify truthfully concerning the charged pseudoephedrine conspiracy offense and other matters, and that the Government had moved for a downward departure in his sentence based on his cooperation with the Government's investigative efforts.

34.    Baste testified that he first met co-defendant Shahin Judeh in 1990, and that he met him again several years later in a restaurant outside of Chicago, Illinois. Around the same time Baste became reacquainted with Judeh, he met co-defendant Ali Salem, with all three men hailing from the Chicago suburbs.

35.    Baste testified that he entered into an agreement with Judeh and Salem in the 2002-03 time frame to obtain pseudoephedrine in Canada and sell it in the United States. According to Baste, Salem's role was to identify and line up a source of pseudoephedrine in Canada. Judeh's role was to sell the pseudoephedrine brought into the United States "to the Mexicans in Fresno, California." (1/27/2010 Trial Tr. at 152.) Finally, Baste's role was as "the U.S. citizen who could go across the [Canadian] border with money, could go to Canada to pay for the merchandise." (*Id.* at 152-53.)

36.    Baste testified that he, Judeh, and Salem understood that the Mexicans in California would use the pseudoephedrine they had purchased to make methamphetamine.

37.    As part of their agreement, Judeh, Salem, and Baste obtained a large

quantity of pseudoephedrine pills in Canada in December of 2002. This followed an earlier transaction in November of 2002 in which Judeh had brought just under 5 million pseudoephedrine pills from Canada into the United States. According to Baste, this earlier transaction was undertaken without Salem's knowledge and "behind his back." (*Id.* at 154-56.)

38.     In the December 2002 transaction, 9 million pseudoephedrine pills were obtained from G & C Imports in Montreal, Canada, at a cost of $171,000. Baste and Shahin Judeh, along with co-defendants Kamal Judeh and Hafez Husein, rented a truck and transported the pills to Windsor, Canada, where they were loaded into a storage facility obtained by Shahin Judeh. Baste identified Government Exhibits 1A through 1H as pictures of the boxes loaded into this storage facility and the contents of these boxes.

39.     As testified by Special Agent Howe, and as reiterated in Baste's testimony, the pseudoephedrine pills obtained in the December 2002 transaction were seized by Canadian law enforcement officials from the Windsor storage facility on December 17, 2002.

40.     Baste testified that he first learned of this seizure in January of 2003, when he and co-defendant Mohammad Awad met with a truck driver who had been hired to transport the pills across the border into the United States. Again, Special Agent Howe offered similar testimony, based on the accounts of undercover agents who posed as truck drivers at this meeting. After this meeting, Baste and Awad traveled to the storage facility, where they discovered that the pills had been seized and the Canadian authorities

had left a copy of a search warrant.

41.     Following the discovery that the pseudoephedrine pills had been seized, Baste participated in one or more meetings to formulate a plan to purchase more pseudoephedrine pills in Canada and transport them to the United States.  One such meeting was held on January 31, 2003, with Baste, Judeh, and another individual (who Baste knew only as "the truck driver") in attendance.  Baste confirmed that Government Exhibits 4A and 4B were photographs of this meeting.

42.      In the course of these meetings, Judeh indicated that he lacked sufficient funds to purchase additional pseudoephedrine pills, but that "he was going to get the money."  (1/27/2010 Trial Tr. at 161.)  It was ultimately decided that 5 million pseudoephedrine pills would be purchased at a cost of approximately $91,000, with $40,000 of this amount provided by Ali Salem, and with Judeh obtaining the remaining funds "from the Mexicans."  (*Id.* at 162, 164.)

43.     In the second week of February 2003, Baste and Awad drove a "bluish-green" GMC Denali sport utility vehicle to Saginaw, Michigan, where they met in a hotel parking lot with Judeh and "two Mexicans," who Baste identified as "Romerio and Chiquito."  (*Id.* at 165-66.)  Judeh and the two Mexicans arrived at this meeting in a pearl white Lexus.  At trial, Baste identified Defendant as the man who was introduced to him as "Romerio" at this meeting.

44.     Awad brought $40,000 to this meeting, which had been provided by Ali Salem.  Judeh, in turn, gave Baste a shoe box with $58,000, which was to be combined

with the $40,000 from Salem and placed in a stash compartment in the Denali.

45.     While Awad remained in the Denali and Defendant and "Chiquito" remained in the Lexus,[3] Baste and Judeh exited their vehicles and had a discussion in the hotel parking lot.  Judeh informed Baste that Defendant would accompany him on his trip to Canada to purchase pseudoephedrine pills because, according to Judeh, Defendant was the source of the $58,000 Judeh gave to Baste and Judeh wanted Defendant to "oversee" the planned purchase of pills from G & C Imports in Montreal.  (*Id.* at 166-69.)

46.     Baste did not witness Defendant give the $58,000 to Judeh.  Instead, his understanding on this point was based solely on what Judeh told him.  Specifically, Judeh advised Baste that the $58,000 in cash was proceeds from the sale of marijuana or cocaine.

47.     Baste initially resisted taking Defendant with him on the trip to Canada, explaining that he did not want a passenger in the vehicle that "doesn't have a U.S. passport to give [us] a hard time when we cross the border."  (*Id.* at 170.)  Nonetheless, Judeh insisted that Defendant go along, explaining to Baste that Judeh "was in a financial struggle" as a result of the December 2002 seizure of pills by the Canadian authorities, that he had to resort to getting funds "through the Mexicans" in order to purchase an additional supply of pseudoephedrine pills, and that Defendant was to accompany Baste in order to "make sure that [Baste] was going to purchase the 5 million pills" with the

[3]As noted earlier, Enrique Sanchez indicated in his testimony that he was sometimes referred to by the nickname "Chiquito."

14

money he had been given.  (*Id.* at 175-76.)

48.     Following this discussion between Baste and Judeh, Baste, Awad, and Defendant got into the Denali and traveled toward the Canadian border.  In light of Baste's concern that Defendant's lack of a U.S. passport would make crossing the border more difficult, Baste dropped Defendant off just before the border, and Defendant traveled across the border by taxi while Baste and Awad remained in the Denali.  Baste and Awad then met up with Defendant on the other side of the Canadian border, at the Windsor Casino.

49.     After spending the night at a Windsor hotel, the three men drove to Montreal the next day.  Baste recalled engaging in only minimal conversation with Defendant over the course of this several-hour drive.  Baste recalled, however, that he and Defendant discussed the Lexus in which Defendant had arrived at the Saginaw meeting the day before, with Defendant telling Baste that if he liked the car, he "could get that car for like 50 [or] 60,000 [pseudoephedrine] pills."  (*Id.* at 181.)

50.     Upon arriving in Montreal, Baste, Awad, and Defendant checked in at the Gouverneur Hotel, and Baste called his contact at G & C Imports, who he knew as "Guy."  Baste recalled that Defendant was present in the car when he called Guy to discuss their planned transaction.  During this call, Baste and Guy arranged a time to meet the following morning.

51.     After spending the night at the hotel in Montreal, Baste, Awad and Defendant traveled the next morning to Guy's office at G & C Imports, where they met

with Guy and his two sons.  Guy counted the money brought by Baste to confirm that "all the money's there," and he provided Baste with a "piece of paper saying that he got the money."  (*Id.* at 195.)  No pseudoephedrine pills were provided at that time; rather, Baste testified that the usual arrangement was to pay for the pills and then return for them about a week later.  Baste testified that he and Awad planned to return to Canada to pick up the pills, and that Defendant was not going to accompany them on that trip.[4]

52.     After giving the money to the contact at G & C Imports, Baste, Awad, and Defendant drove back from Montreal to Michigan.

53.     Baste confirmed that the photographs introduced as Government Exhibits 7A and 7B depicted Awad, Defendant, and himself during their trip to Montreal.  He could not say for certain where these pictures were taken, but believed that they most likely were taken in Montreal.  According to the testimony of Special Agent Howe, the Government obtained these photographs from Canadian law enforcement officials, who reported that they were surveillance photos taken at the Gouverneur Hotel in Montreal on February 14, 2003.

54.     On the return trip to Michigan, Baste once again dropped off Defendant at

---

[4]After Baste concluded his testimony, Special Agent Howe was recalled to the stand to recount an interview he conducted of Baste on December 15, 2009.  According to Special Agent Howe's report of this interview, Baste could not recall at the time whether Defendant was physically present with him and Awad when they traveled to Guy's office and gave him the money for a forthcoming delivery of pseudoephedrine pills.  (*See id.* at 264.)  In his trial testimony, however, Baste expressed his belief that Defendant had, in fact, accompanied him and Awad to their meeting with Guy, and he could not recall having stated otherwise in his interview with Special Agent Howe.  (*See id.* at 226-29.)

the Windsor Casino, so that Defendant again could cross the United States/Canada border in a taxi while Baste and Awad continued across the border in the Denali.

55.     Although they were traveling in separate vehicles, all three men were stopped by U.S. Customs and referred to secondary inspection as they crossed the border. Baste witnessed Defendant in the secondary inspection area as he was being questioned by customs officials. Baste stated that he had visited the casino while in Canada, and he was then released to continue his travel. He and Awad drove to Chicago, while Judeh advised him that he (Judeh) would pick up Defendant once he had crossed the border to the United States.

56.     Baste testified that he made two more trips to Canada following this trip with Awad and Defendant in mid-February 2003. About ten days later, he drove to Toronto to purchase some "dollar store goods" to put with the pseudoephedrine pills as they were brought over the border to the United States, because Baste had been advised by a truck driver that it "wouldn't look good" to travel with a cargo consisting only of pills. (*Id.* at 201-02.)

57.     Next, in early March of 2003, Baste flew to Montreal to retrieve the funds he had given to Guy to purchase pseudoephedrine pills. Guy had reported that he was "having problems with the Canadian government" and could no longer provide the pills. Consequently, he asked Ali Salem to pick up the money given to him in mid-February, and Salem, in turn, asked Baste to travel to Montreal and retrieve the funds.

58.     Special Agent Howe testified that G & C Imports' inability to provide the

pseudoephedrine pills was attributable to a February 20, 2003 raid of warehouses in Ottawa, Canada by Canadian law enforcement officials. In this raid, 8.2 tons of pseudoephedrine were seized from G & C's supplier, Con Fab Laboratories. In addition, Canadian law enforcement officers raided the Montreal offices of G & C Imports on February 21, 2003, seizing approximately $275,000 in U.S. dollars and approximately $800,000 in Canadian currency.

59. After Baste retrieved the money he had paid to Guy, he gave $40,000 to "Ali Salem['s] and Mohammad Awad's people in Montreal," he gave another $40,000 to an individual in Toronto known to Judeh and co-defendant Hafez Husein, and Baste then spent a portion of the remaining $11,000 and returned to the United States with approximately $9,500. (*Id.* at 204-05.)

60. On April 15, 2003, Baste was arrested in Chicago by federal ICE agents, and he gave his consent to a search of his apartment. This search uncovered, among other items, a key card from Baste's stay at the Gouverneur Hotel in Montreal (admitted as Government Exhibit 22), a plane ticket for Baste's March 3, 2003 flight from Chicago to Montreal (admitted as Government Exhibit 27), and a copy of the Canadian search warrant Baste found in the storage locker in Windsor when he attempted to retrieve pseudoephedrine pills from this storage facility in mid-January of 2003 (admitted as Government Exhibit 29).

**(iii)    The Testimony of Co-Defendant Shahin Judeh**

61. As noted earlier, co-defendant Shahin Judeh was called as a witness by the

Court pursuant to Fed. R. Evid. 614(a). (*See* 2/10/2010 Order.) Defendant objected to this decision, but the Court overruled these objections. (*See* 3/16/2010 Order.)

62. Judeh acknowledged that he had pled guilty of conspiracy to distribute with intent to import and to import pseudoephedrine. He testified that this conspiracy spanned from 2001 to 2003.

63. Judeh described himself as a "middleman" in this conspiracy, who would procure supplies of pseudoephedrine and then sell them to others for profit. In this role, he worked with co-defendants Hafez Husein, Ali Salem, Nasir Baste, and Enrique Sanchez, as well as Defendant and an individual in Canada he identified as "Guy."

64. Judeh identified Salem and Husein as his main suppliers of pseudoephedrine, and Defendant and a couple of other unidentified individuals as his principal buyers.

65. Judeh claimed that he was never involved in any pseudoephedrine transactions before he met Defendant. When Defendant, either directly or through a representative, inquired whether Judeh knew of anyone in Chicago who might have pseudoephedrine for sale, Judeh asked Husein and was told that he (Husein) had sources from which he could obtain pseudoephedrine.

66. Judeh testified that he began selling pseudoephedrine to Defendant in 2002. Some of these sales were for cash, and others were in exchange for 4 to 5 kilograms of cocaine.

67. Judeh recalled one occasion when he met with Defendant and co-defendant

Enrique Sanchez at a barbeque at his girlfriend's house in California. On this occasion, the men discussed a transaction in which Judeh would provide pseudoephedrine to Defendant for cash, and Defendant and others would then bring the pseudoephedrine to California.

68. Judeh testified that some of his discussions with Defendant about their drug transactions occurred at his apartment in Chicago, and that Sanchez was present for at least some of these discussions.

69. Judeh also described a meeting with Defendant in Montreal in approximately December of 2002. Judeh testified that he was sent on this trip by co-defendant Salem, who was on a tether and could not travel to Canada. The purpose of this trip was to purchase pseudoephedrine on Salem's behalf from Guy, the conspiracy's Canadian supplier. Defendant contacted Judeh during this trip and expressed an interest in purchasing the pseudoephedrine Judeh planned to acquire, but Judeh advised him that this shipment had already been sold to someone else, and that he would have to wait for the next shipment.

70. The next meeting between Judeh and Defendant took place after Judeh learned from co-defendant Baste that the Canadian government had seized a supply of pseudoephedrine from a storage locker in Windsor. Judeh had made arrangements to travel to Brazil, but co-defendant Salem urged him to forgo his travel plans and participate in one more planned trip to Canada to acquire pseudoephedrine. Judeh agreed, and met with Defendant, Sanchez, Baste, and Mohammad Awad in Saginaw, Michigan to

discuss this transaction.

71.     Judeh testified that co-defendants Salem and Husein provided the funds for this planned transaction, with Judeh giving Baste a shoe box containing Husein's $58,000 contribution toward the planned purchase.  According to Judeh, Defendant also brought some of his own money on this trip, which he planned to use to purchase a portion of the overall supply of pseudoephedrine that was to be obtained during this trip.  In accordance with this understanding, Judeh instructed Baste that some of the boxes of pseudoephedrine he purchased in Canada should be given to Defendant.

72.     According to Judeh, Defendant asked to go along on the trip to Canada after he learned that pseudoephedrine could be more cheaply obtained there.  As Judeh understood it, however, Defendant would not be purchasing pseudoephedrine directly from the Canadian supplier, but instead would be purchasing a portion of the supply of pseudoephedrine that Baste planned to obtain from this Canadian supplier.  Defendant's purchase would not necessarily have been limited to the amount of cash he brought on the trip, because Judeh testified that he had occasionally provided goods to Defendant with the understanding that Defendant would pay him later.

73.     Following the Saginaw meeting, Judeh and Sanchez remained in Michigan while Baste, Awad, and Defendant traveled to Montreal, Canada in a black Denali sport utility vehicle belonging to Judeh to purchase pseudoephedrine from Guy, the Canadian supplier.  The travelers contacted Judeh during their trip, and advised him that Guy needed a week to obtain the pseudoephedrine.  The three men indicated that they did not

wish to remain in Canada while they waited for the pseudoephedrine, and they instead returned to the United States.

74.     Judeh next spoke to Defendant upon his return from this trip to Canada. Defendant indicated that he had been questioned by customs officials as he crossed the border into the United States.  He further stated that no pseudoephedrine had been obtained during the trip, as Guy had advised the travelers to remain on call for a week or two until the supply of pseudoephedrine was available.

75.     On cross-examination by Defendant's counsel, Judeh admitted that he had sent a letter to his attorney falsely stating that co-defendant Enrique Sanchez had nothing to do with Judeh's activities in the charged pseudoephedrine conspiracy.  Judeh testified that he wrote this letter with Sanchez's assistance while the two men were housed in the same "pod" at the Wayne County and St. Clair County jails, and that he did so out of concern for the safety of his family, since Sanchez and the other individuals involved in his drug dealings knew where he and his family lived.

**C.     Summary of Factual Findings Regarding the Charged Conspiracy Offense**

76.     The testimony at trial established the existence of an agreement among co-defendants Shahin Judeh, Ali Salem, Nasir Baste, Mohammad Awad, and others to obtain supplies of pseudoephedrine in Canada, transport these supplies into the United States, and sell them for cash or drugs.

77.     Pursuant to this agreement, approximately 9 million pseudoephedrine pills were purchased in December of 2002 from G & C Imports in Montreal, Canada, and these

pills were then placed in a storage facility in Windsor, Canada.

78.     An effort in January of 2003 to transport these pseudoephedrine pills from Canada to the United States was thwarted when it was discovered that the pills had been seized by Canadian law enforcement officials.

79.     Following this seizure, Judeh and Salem, and perhaps others, made plans for another trip to Canada to obtain an additional supply of pseudoephedrine from G & C Imports in Montreal.

80.     In preparation for this trip, Judeh, Sanchez, and Defendant traveled from Chicago to Saginaw, Michigan in mid-February of 2003, where they met in a hotel parking lot with Baste and Awad.

81.     At the conclusion of this meeting, Baste, Awad, and Defendant departed in a GMC Denali sport utility vehicle and traveled to Montreal, Canada with approximately $98,000 in cash, which Baste planned to give to his contact at G & C Imports, Guy, in exchange for pseudoephedrine pills that were to be supplied at a later date.

82.     In the course of this trip, the three men drove to Montreal, met with Guy, gave him the money brought for the purpose of purchasing pseudoephedrine, and then drove back from Montreal to Michigan.

83.     Defendant stipulated at trial that he went along with Baste and Awad on this trip to Montreal, Canada in mid-February of 2003.  (*See* 1/27/2010 Trial Tr. at 249.)

84.     In light of these factual determinations and the parties' stipulations, the only remaining questions for the Court to decide are whether Defendant knowingly and

intentionally joined and participated in the conspiracy among co-defendants Judeh,

Salem, Baste, Awad and others to import pseudoephedrine from Canada into the United

States, knowing or having reasonable cause to believe that the pseudoephedrine would be

used to manufacture a controlled substance (namely, methamphetamine).

### III.  CONCLUSIONS OF LAW

**A.      The Standards Governing the Court's Determination Whether Defendant Is Guilty of the Charged Conspiracy Offense**

1.      Defendant has been charged in the first superseding indictment with a

single count of conspiracy to distribute with intent to import and to import

pseudoephedrine from Canada into the United States, contrary to 21 U.S.C. §§ 959(a)(1)

and 960(d)(3).  The first of these statutes provides:

> It shall be unlawful for any person to manufacture or distribute a . . . listed chemical —
>
> (1) intending that such . . . chemical will be unlawfully imported into the United States . . . .

21 U.S.C. § 959(a)(1).  The second of these cited statutes provides:

> A person who knowingly or intentionally —
>
> (3) imports or exports a listed chemical knowing, or having reasonable cause to believe, that the chemical will be used to manufacture a controlled substance in violation of this subchapter or subchapter I of this chapter . . .
>
> shall be fined in accordance with Title 18, imprisoned not more than 20 years in the case of a violation of paragraph . . . (3) involving a list I chemical . . . , or both.

21 U.S.C. § 960(d).  The chemical identified in the indictment, pseudoephedrine, qualifies

as both a "listed chemical" and a "list I chemical" within the meaning of these statutes.

*See* 21 U.S.C. § 802(34)(K) (defining the term "list I chemical" as including

pseudoephedrine); 21 U.S.C. § 802(33) (defining the term "listed chemical" as

"mean[ing] any list I chemical or any list II chemical").

2.     The overarching conspiracy offense charged in the indictment is defined

under a separate statute providing:

> Any person who attempts or conspires to commit any offense
> defined in this subchapter shall be subject to the same penalties as those
> prescribed for the offense, the commission of which was the object of the
> attempt or conspiracy.

21 U.S.C. § 963.

3.     There are three elements to the charged conspiracy offense:  (i) an

agreement among two or more persons to violate the drug laws (in this case, 21 U.S.C. §§

959(a)(1) or 960(d)(3)), (ii) knowledge of and intent to join the conspiracy, and (iii)

participation in the conspiracy.  *See United States v. Gardner,* 488 F.3d 700, 710 (6th Cir.

2007); *see also United States v. Levit,* No. 00-4414, 39 F. App'x 97, 102 (6th Cir. Apr.

17, 2002) (setting forth the same three elements for a conspiracy offense under 21 U.S.C.

§ 963).  The Government must prove each of these elements beyond a reasonable doubt.

*See Gardner,* 488 F.3d at 710.

**B.     The Government Has Proven Beyond a Reasonable Doubt Each of the
Elements of the Charged Conspiracy Offense.**

4.     At trial, Defendant acknowledged that the Government had established the

first element of the charged conspiracy offense:  namely, the existence of an agreement

among two or more persons to distribute the list chemical pseudoephedrine intending that it would be unlawfully imported into the United States, and to import pseudoephedrine knowing, or having reasonable cause to believe, that it would be used to manufacture a controlled substance. (*See* 1/27/2010 Trial Tr. at 272-73.) Thus, the Court need address only the remaining two elements of the offense.

5. With regard to these two elements of a conspiracy offense, the Sixth Circuit has explained:

> . . . [T]he government must show the willful membership of the defendant in the conspiracy, but the government need not prove that the defendant committed an overt act in furtherance of the conspiracy. Further, while the connection between the defendant and the conspiracy need only be slight, mere association with conspirators is not enough to establish participation. Finally, knowledge of and participation in the common purpose and plan of a conspiracy may be inferred from the defendant's actions and reactions to the circumstances.

*Gardner,* 488 F.3d at 711 (citations omitted).

6. Plainly, the portion of the trial record in this case that bears most directly upon the remaining issues before the Court — namely, Defendant's knowledge of, intent to join, and participation in a conspiracy to distribute and import pseudoephedrine — is the evidence that in mid-February of 2003, Defendant went along with co-defendants Nasir Baste and Mohammad Awad on a trip from Saginaw, Michigan to Montreal, Canada. As set forth above, the evidence at trial established that Baste and Awad, among others, were participants in a conspiracy to obtain supplies of pseudoephedrine pills from G & C Imports in Montreal and transport these pills into the United States for sale and,

ultimately, use in manufacturing methamphetamine. The evidence further established that the purpose of this February 2003 trip to Montreal, at least for Baste and Awad, was to make a cash payment toward the procurement of additional supplies of pseudoephedrine from a contact at G & C Imports.

7.    Defendant's "mere presence" on a trip where his traveling companions were engaged in illegal drug activity "does not by itself demonstrate any tacit or mutual understanding between the defendants." *United States v. Peters,* 15 F.3d 540, 544 (6th Cir. 1994) (internal quotation marks and citation omitted). Rather, the Government must establish that Defendant was aware of the purpose of this trip, and that he was a willful participant in this purpose and plan. *See Gardner,* 488 F.3d at 711.

8.    The Court finds that the Government has proven beyond a reasonable doubt that Defendant was a knowing and willful participant in the mission of the February 2003 trip to Canada — namely, to make a payment toward the procurement of a supply of pseudoephedrine from G & C Imports in Montreal. First, co-defendant Enrique Sanchez testified at trial that he participated in a meeting in Chicago with Defendant and co-defendant Shahin Judeh at which the plan for this February 2003 trip was discussed. According to Sanchez, the participants in this meeting, including Defendant, shared an understanding that the purpose of the forthcoming trip to Canada was to obtain a supply of pseudoephedrine pills. During this meeting, Defendant stated his intention to go along on the trip to Canada, and he further stated that he planned to sell in California the

pseudoephedrine pills obtained in this forthcoming transaction.[5]

9.    The Court credits Sanchez's testimony on this point, on a number of grounds.  First, Shahin Judeh confirmed during his testimony that Sanchez was present at a meeting where he and Defendant discussed the February 2003 trip to Canada.  Next, the evidence at trial established that after this meeting, Defendant did, in fact, travel with Sanchez and Judeh in mid-February of 2003 from Chicago to Saginaw, Michigan, where the three men met with co-defendants Baste and Awad in a hotel parking lot.  According to Sanchez, Defendant once again stated during the trip from Chicago to Saginaw that the purpose of the trip to Canada was to make an initial payment on a supply of pseudoephedrine pills.  Finally, Sanchez's testimony about Defendant's stated intention to go along on the trip to Canada is corroborated by the undisputed fact that Defendant actually accompanied Baste and Awad on this trip.

10.    Apart from Sanchez's testimony as to Defendant's own statements regarding (i) his awareness of the purpose of the February 2003 trip to Canada and (ii) his intention to participate in the acquisition of pseudoephedrine that was the object of this trip, other evidence at trial also established these elements of the charged conspiracy offense.  First, co-defendant Judeh testified about an ongoing relationship in which he sold pseudoephedrine to Defendant in exchange for either cash or cocaine.  As part of this ongoing series of transactions, Judeh described an occasion in December of 2002 when

---

[5]The Court notes that Defendant's statements during this Chicago meeting are admissible against him as non-hearsay.  *See* Fed. R. Evid. 801(d)(2)(A).

Defendant expressed an interest in purchasing a supply of pseudoephedrine Judeh planned to acquire, but Judeh responded that this shipment had already been sold to someone else and that Defendant would have to wait for the next shipment. This testimony corroborates the conclusion that Defendant was not merely present on the subsequent February 2003 trip to Canada, but instead was invited by Judeh to go along on this trip so that Judeh could make good on his promise to sell to Defendant at least a portion of an anticipated next shipment of pseudoephedrine.

11. Along the same lines, Judeh testified that he instructed Baste to give to Defendant some of the boxes of pseudoephedrine that were to be acquired as a result of the February 2003 trip to Canada. Judeh further testified that Defendant would not necessarily be required to pay in full for the boxes of pseudoephedrine given to him by Baste, because he had occasionally provided such supplies to Defendant with the understanding that Defendant would pay him later. Again, this testimony lends further support to the conclusion that Defendant had knowledge of the purpose of the February 2003 trip to Canada, and that he went along on this trip with Baste and Awad in order to pursue the shared objective of securing pseudoephedrine from a supplier in Montreal.

12. On cross-examination, defense counsel suggested that Judeh could only speculate about what actually transpired during the February 2003 trip to Montreal, and that he could not say for certain that Defendant made this trip as a participant in the ongoing conspiracy among Judeh, Baste, Awad, and others to acquire pseudoephedrine from a Canadian supplier. Judeh, however, responded with certainty that Defendant went

on this trip for the same purpose as Baste and Awad, and that Defendant would have been given a share of any pseudoephedrine acquired as a result of this trip. The Court credits Judeh's testimony on this point, in light of its consistency with the remainder of the testimony at trial, and in light of Judeh's forthright manner and appearance as he gave this testimony.

13. The testimony of co-defendant Baste also tends to show that Defendant was not merely present on the February 2003 trip to Canada, but instead traveled with Baste and Awad with the knowledge and intent to participate in the shared objective of this trip. Baste testified that he was reluctant to bring Defendant on this trip because he lacked a U.S. passport, but that Judeh insisted that Defendant be brought along to oversee the planned purchase of pseudoephedrine.[6] To be sure, there was a discrepancy between the

---

[6]The Court notes that it may only consider Baste's testimony as to what Judeh told him if Judeh's statement qualifies under Fed. R. Evid. 801(d)(2)(E) as the "statement by a coconspirator of a party during the course and in the furtherance of the conspiracy." Moreover, in determining whether Judeh's statement qualifies as non-hearsay under this Rule, the statement itself is not "alone sufficient to establish" the requisite conspiracy and the participation of Judeh and Defendant in this conspiracy. Fed. R. Evid. 801(d)(2).

For the reasons already explained, the Court finds a sufficient basis in the record for concluding that Judeh's statement to Baste was made during the course of and in furtherance of a conspiracy in which Judeh, Baste, and Defendant participated. As noted earlier, Defendant has acknowledged the existence of a conspiracy to procure supplies of pseudoephedrine from Canada for importation into the United States. Moreover, when Judeh made the statement at issue, Baste was about to embark upon a trip that unquestionably was part of, and undertaken in furtherance of, this acknowledged conspiracy, and the testimony of Judeh and Baste established their participation in this conspiracy. Finally, in concluding that Defendant also participated in this conspiracy, the Court relies not only on Judeh's statement, but on independent corroborative evidence including (i) the undisputed fact that Defendant did, in fact, proceed to travel along with Baste on the trip to Canada, (ii) Sanchez's testimony that Defendant had stated his intention to go on this trip during an earlier meeting in Chicago, and (iii) Judeh's testimony as to an ongoing relationship in which he sold pseudoephedrine to Defendant.

testimony of Baste and Judeh regarding Defendant's role in financing the planned purchase — Baste testified that Judeh told him Defendant had provided $58,000 toward the purchase, while Judeh testified that these funds came from co-defendant Hafez Husein. Nonetheless, the inconsistency in the testimony on this point does not undermine the consistency of Baste's and Judeh's accounts on a more salient point — namely, that Defendant was not simply along for the ride on the February 2003 trip to Canada, but instead went on this trip for the purpose of obtaining a portion of the pseudoephedrine that was to be acquired (or at least paid for) on this trip.

14.     Finally, the circumstances surrounding the February 2003 trip itself give rise to a reasonable inference that Defendant went on this trip as a knowing and willful participant in a shared agreement to import pseudoephedrine from Canada into the United States for sale and use in manufacturing methamphetamine. The entirety of this trip was devoted to driving to Montreal, meeting with a contact at G & C Imports, giving this contact a payment for a supply of pseudoephedrine pills, and then returning immediately to the United States. The short time line of this trip undermines any inference that Defendant might have gone along for some purpose other than the objective that motivated his fellow travelers. Likewise, there was no evident purpose to the trip made by Defendant, Judeh, and Sanchez from Chicago to Saginaw other than to rendevous with Baste and Awad, provide a portion of the funds to be paid to the contact at G & C Imports, and allow Defendant to join Baste and Awad as they carried out their plan to travel to Montreal and pay for a supply of pseudoephedrine. For Defendant to participate

in these two trips, first from Chicago to Saginaw and then proceeding to Montreal, surely

qualifies as suspicious behavior, and thereby lends additional support to the inference that

Defendant knowingly chose to participate in the February 2003 trip to Canada for the

shared purpose of advancing the charged conspiracy offense.

## IV. <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY FOUND by the Court, as trier of fact, that

the Government has proven beyond a reasonable doubt that Defendant Alberto Flores is

GUILTY of the conspiracy offense charged in Count One of the first superseding

indictment.

<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

Dated:  September 2, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 2, 2010, by electronic and/or ordinary mail.

<u>s/Ruth A. Gunther</u>
Case Manager